IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT
OF NORTH CAROLINA

| | |
|---|---|
| MICHAEL CROWELL, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 1:17-cv-515-WO-JEP |
| ) | |
| STATE OF NORTH CAROLINA, et al. ) | |
| ) | |
| *Defendants.* ) | |

## PLAINTIFF'S RESPONSE OPPOSING
## MOTION FOR STAY

On September 10, 2018, defendant-intervenors President Pro Tem Berger and Speaker Moore moved to stay proceedings pending resolution of related state litigation and a state referendum on a constitutional amendment (Dkt 47). Plaintiff opposes the stay and submits this brief in opposition.

### NATURE OF ACTION

This is an action challenging the constitutionality of the North Carolina statutes which exclude unaffiliated voters from serving on the State Board of Elections and the 100 county boards of election. When the complaint was filed in June 2017 the State Board was comprised of eight members and each county board comprised of four members, evenly divided between Democrats and

1

Republicans. Since then the General Assembly has changed the composition and selection of election board members several times; Governor Cooper has filed two state court actions contending that those provisions on selection of board members violate separation of powers; the state supreme court has ruled in his favor in one lawsuit and a trial court decision is pending in the other; and the General Assembly has placed a proposed constitutional amendment on the ballot for November 2018 to define the size and selection of the State Board.

Plaintiff has sought leave to amend his complaint to account for the new developments (Dkt 44). Defendant-intervenors have opposed the amendment as premature (Dkt 49) and at the same time moved to stay proceedings.

## STATE PROCEEDINGS

Although defendant-intervenors have described state proceedings in detail (Dkt 48 at 2-9), much of what they say is unimportant to the present case, and they have skimmed over some features especially pertinent to this dispute. Here is a more useful summary:

- From the creation of the State Board of Elections in 1901 until 2017 the State Board was comprised of five members appointed by the governor, three from nominations by the governor's political party and two from nominations by the other major political party. The 100 county boards of election were appointed, in turn, by the State Board, and were comprised of three members, two from nominations of the governor's party and one from nominations of the other party. Consequently, all 305 election board members were either Democrats or Republicans; no unaffiliated voters could be appointed.

2

- In December 2016, following the election of Democrat Cooper as governor, the Republican-controlled General Assembly enacted N.C. Session Law 2016-125 replacing the State Board with a "Bipartisan State Board of Elections and Ethic Enforcement" comprised of eight members. Four members were to be appointed by the governor, two Democrats and two Republicans, from nominations by those parties. The other four members were to be appointed by the General Assembly, two Democrats and two Republicans, from nominations by majority and minority party leaders. County boards were to be comprised of four members, two Democrats and two Republicans, appointed by the State Board from party nominations. If the act had been implemented, the 408 election board members statewide would have been evenly divided between Democrats and Republicans, and there would be no unaffiliated voters on the boards.

- Governor Cooper challenged the election board selection process as a violation of separation of powers in *Cooper v. Berger*, Wake Co. Super. Ct., No. 16 CVS 15636 ("*Cooper v. Berger I*"). In March 2017 the superior court enjoined enforcement of the 2016 act.

- In April 2017 the legislature responded by enacting Session Law 2017-6, again providing for an eight-member State Board, all to be appointed by the governor, four Democrats and four Republicans, from nominations by the two parties. The act also kept four-member county boards, two Democrats and two Republicans. As before, if the act had been implemented the 408 election board members would be evenly divided between Democrats and Republicans and there would be no unaffiliated voters on the boards.

- Governor Cooper challenged the 2017 act for violation of separation of powers in *Cooper v. Berger*, Wake Co. Super. Ct., No. 17 CVS 5084 ("*Cooper v. Berger II*"). In January 2018 the North Carolina Supreme Court upheld the governor's challenge to the selection of the State Board in *Cooper v. Berger*, 370 N.C. 392 (2018).

- In February 2018 the General Assembly tried once again to thwart the governor by enacting Session Law 2018-2 providing for a nine-member State Board. The governor appoints four members each from nominations of the Democratic and Republican parties, then those eight members nominate two voters not affiliated with either

3

party and the governor appoints one of the two. The county boards remain two Democrats and two Republicans.

- Governor Cooper has challenged the 2018 act for violation of separation of powers in *Cooper v. Berger*, Wake Co. Super. Ct., No. 18 CVS 3348) ("*Cooper v. Berger IV*"). Dispositive motions were heard by the trial court in July 2018 but no decision has been rendered. Meanwhile, the election board members have been appointed, resulting in four Democrats, four Republicans, and one unaffiliated voter on the State Board, and 200 Democrats and 200 Republicans on the county boards, i.e., one unaffiliated board member out of 409.

- In June 2018 the General Assembly opened another front in its dispute with the governor by passing Session Law 2018-117. The act set a referendum in November 2018 on a constitutional amendment to specify that the State Board is to consist of eight members, no more than four of whom may be from the same party. The legislation provided that all eight members would be appointed by the General Assembly, four each from recommendations by leaders of the two major parties.

- Following lawsuits by the governor and others challenging the wording of the constitutional amendment ballot, in August 2018 the General Assembly enacted Session Law 2018-133 [Exhibit A, attached] to rewrite the amendment. As it now appears on the November 6, 2018, ballot, the amendment provides for an eight-member Bipartisan State Board of Elections and Ethics Enforcement to be appointed by the governor. No more than four members may be from the same political party, and all the appointments are to be made from nominations submitted to the governor by the legislative leaders of the two major parties.

The most noteworthy aspect of this history is that in no legislation from 1901 to the present is provision made for more than a one lone unaffiliated voter to be appointed to an elections board statewide. The high water mark for independent voters is the single unaffiliated voter currently on the State Board — the only unaffiliated voter out of the 409 total election board members

4

statewide. That is, the most generous iteration of state law in the last 117 years gives unaffiliated voters, who make up nearly a third of registered voters in the state, less than one quarter of one percent of election board members. And the constitutional amendment, if approved in November, would eliminate that single representative of independent voters.

Also noteworthy is that all the parties in the state litigation — Governor Cooper, President Pro Tem Berger, and Speaker Moore — uniformly take the same position in this case: that allowing only Democrats and Republicans to serve on election boards is constitutional and that plaintiff and the other two million unaffiliated voters in the state have no legal basis to complain.

Given both the long-term and recent history of state action on boards of election, and the uncompromising positions of defendants and defendant-intervenors in the present case, there is no reason to believe that ongoing state matters will materially affect plaintiff's constitutional claim. There is no sound basis for a stay, and a stay will only serve to prolong the denial of unaffiliated voters' constitutional rights.

## ARGUMENT

Defendant-intervenors argue that the appropriateness of a stay should be analyzed under both the *Colorado River* doctrine (*Colorado River Conservation Dist. v. United States*, 424 U.S. 800 (1976), and the *Landis* doctrine (*Landis v. North Am. Co.*, 299 U.S. 248 (1936) (Dkt 48 at 10-14). The

5

*Colorado River* doctrine, though, is not applicable to this case, and an analysis applying the *Landis* factors shows that the court should deny the stay.

"[A] court must apply *Colorado River* abstention 'parsimoniously.'" *vonRosenberg v. Lawrence*, 849 F.3d 163, 167 (4th Cir. 2017) (quoting *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir. 2005). The first question for the court to consider under *Colorado River* is whether the federal and state actions are parallel; whether they are is to be strictly construed. *Id.*, at 168. "In addition, even state and federal claims arising out of the same factual circumstances do not qualify as parallel if they differ in scope or involve different remedies." *Id.*

> Rather, a federal court may abstain under *Colorado River* only if it 'concludes that the parallel state-court litigation will be an adequate vehicle for the *complete* and prompt resolution of the issues between the parties.' *Moses H. Cone*, 460 U.S. at 28, 103 S.Ct. 927 (emphasis added [*by vonRosenberg*]). If there is any serious doubt that the state action would resolve *all* of the claims 'it would be a serious abuse of discretion' to abstain. *Id.*

849 F.3d at 168.

The ongoing state litigation between the governor and legislative leaders over the State Board of Elections is not parallel to this case. That dispute is about separation of powers, i.e., whether the governor gets to control a majority of the board, and in no way addresses the exclusion of unaffiliated voters. Plaintiff, of course, is not a party to the state actions and the state proceedings cannot resolve his claims.

6

While *Colorado River* does not apply, it is appropriate for the court to analyze defendant-intervenors' motion under *Landis* and related case law concerning the court's inherent authority to control its docket. As defendant-intervenors state, the principal *Landis* factors are "the interests of judicial economy, the hardship and inequity to the moving party in the absence of a stay, and the potential prejudice to the non-moving party in the event of a stay." *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F.Supp.3d 428, 452 (M.D.N.C. 2015). Elsewhere courts have described the following considerations as important in deciding whether to issue a stay: "it must be clear that (1) the interests of justice require it, (2) that adjudication of the claim would be a waste of judicial effort, and (3) that the plaintiff will not be substantially harmed by the delay." *555 M Mfg., Inc. v. Calvin Klein, Inc.*, 13 F.Supp2d 719, 724 (N.D.Ill. 1998) (citing *Hess v. Gray*, 85 F.R.D. 15, 27 (N.D.Ill. 1979)).

<u>Judicial economy, interests of justice</u>. The court's interest is in resolving legitimate disputes efficiently, without undue burden on the court or the parties, and without unnecessary delay. Those interests are best served by denying the motion for a stay.

The essence of defendant-intervenors' argument is that state proceedings could so affect the facts as to make any intervening federal action meaningless. Defendant-intervenors predict in general terms that the state

7

proceedings "could render Plaintiff's claims . . . moot or, at least, have an impact on the scope of Plaintiff's claims" (Dkt 48 at 2); that if the governor succeeds in his litigation "Plaintiff's claims will be rendered moot or, at least, will be significantly affected" (Dkt 48 at 12); and that "Plaintiff's claims and Defendants' defense of such claims will be greatly affected" if the constitutional amendment passes (Dkt 48 at 14). Defendant-intervenors, though, never explain exactly how the claims might be affected. In fact, as a closer review of the state proceedings shows, they will not resolve the constitutional issue in this case, nor is there any reason to think the outcome in state proceedings will substantially affect this court's consideration of that issue.

As described above, the separation of powers litigation between the governor and the legislature is over whether the governor is entitled to appoint a majority of election board members from his political party (Democratic) or whether the leaders of the General Assembly may require that half come from their party (Republican). The only effect on unaffiliated voters is whether the current scheme providing for a single member of the State Board not affiliated with either party will survive. Contrary to any assertion by defendant-intervenors, plaintiff's constitutional claim here will not be mooted or substantially affected. Plaintiff's claim is equally viable whether there is one unaffiliated election board member out of 409 — chosen by Democratic and Republican party representatives —or none at all.

8

Defendant-intervenors rely particularly on an assertion that the proposed constitutional amendment could moot plaintiff's claim. Their superficial analysis is that plaintiff will have no basis for claiming the exclusion of unaffiliated voters because the constitutional amendment [Ex. A] does not specifically state that only Democrats and Republicans may serve on the new Bipartisan State Board; all it says is that no more than four board members may be affiliated with the same party. In so arguing, defendant-intervenors glide over the actual wording of the proposed amendment.

First, the amendment calls for a "bipartisan" state board, not a "nonpartisan" board. Bipartisan means two parties and only two parties. The title of the board accurately reflects the General Assembly's intent that only Democrats and Republicans will be represented.

The intent to limit the board to Democrats and Republicans is confirmed by the selection process spelled out in the proposed amendment. All appointments must come from names put forward by the legislative leaders of the two largest political parties. It strains credibility to think that either Democratic or Republican legislative leaders will willingly forfeit their own party's representation on the State Board so that another party will fill the place of the second party on the <u>bipartisan</u> board.

9

In any event, the constitutional amendment will be approved or rejected on November 6th, three weeks from now. If indeed the amendment passes, and the defendant-intervenors persist in their belief that it moots plaintiff's lawsuit, they may file their motion to dismiss at that time. There is no need for a stay to give them that option.

It is possible, of course, that, whatever the outcome of the present state litigation and the November referendum the legislature will continue its whack-a-mole approach to the governor's challenges: the General Assembly changes the State Board, the governor sues, the governor wins, the legislature changes the board again, the governor sues, the governor wins, the legislature changes the board again . . . . There is no way for this court to anticipate such future mischief and how it might affect this case. Certainly there is no basis to think that contrary to history of the last 117 years, and to the positions they have taken in this case, either the General Assembly or governor will want to see that unaffiliated voters are properly represented in new legislation.

The issues this court will need to resolve, therefore, will not be materially affected by the pending state matters. Nor is this a case which should require a great amount of court time — other than defendant-intervenors' procedural motions. The parties already have stated that they do not believe discovery will be needed, that the material facts will not be in dispute, that they likely can stipulate to any information needed by the court, and that the case should be

10

decided on dispositive motions (Dkt 18). Consequently, the likelihood that the state proceedings will have any effect on the scheduling of a trial or the preparation of witnesses in this case is minimal, nor there is no reason to think that duplication of effort will be required. As already discussed, the legal issue to be decided by the court has already been framed and will not be changed significantly by state developments. The same fundamental flaw in appointment of election board members will remain regardless of whether the governor or legislature comes out on top in their disputes.

<u>Burden on defendants</u>. Plaintiff notes that it is only defendant-intervenors Berger and Moore, not the defendants, who have opposed plaintiff's motion to amend his complaint and who have asked for a stay. Defendants themselves have not suggested that they would be burdened by the failure to grant a stay.

The gist of defendant-intervenors' argument about the burden on them is that they will be required to spend time preparing to defend issues that may become moot or be substantially affected by the state proceedings. As already shown, though, the *Cooper v. Berger* lawsuit, and the proposed constitutional amendment, will make virtually no change in the opportunity for unaffiliated voters to serve on election boards, regardless of the outcomes. The governor and the legislature are fighting over which of their two parties gets to control

11

the election boards, and the only stake independent voters have in those matters is whether the single unaffiliated board member loses his place.

Other than their generalized assertions about the potential effect of state proceedings, defendant-intervenors give no explanation as to how they will be burdened by this case proceeding without a stay. They do not provide specifics because there are none. There will be no additional discovery required of defendant-intervenors; there will be no additional witnesses to be interviewed; and there will be no additional legal research to be completed. The constitutional issue at the heart of this case — whether unaffiliated voters have a right to be represented on election boards — will not change regardless of the outcome of *Cooper v. Berger IV* or the constitutional amendment.

<u>Burden on plaintiff</u>. The burden on plaintiff and the two million other unaffiliated voters is real and is affected by a stay. Plaintiff and other independent voters are being denied, day after day, their right to participate fully in the election process. Election boards comprised solely of Democrats and Republicans are making decisions that have substantial effect on unaffiliated voters and candidates. They are deciding where one-stop voting sites should be located and what hours they will be open. They are deciding challenges to the eligibility of voters and candidates. They are deciding what accommodations need to be made for voters in light of two hurricanes. They will decide how to

12

respond to polling place problems on election day. They will count votes, certify results, and hear and decide election protests. In all these activities the election boards will have Democratic and Republican members to look out for those parties' interests, but no one representing the 31 percent of the state's voters who have chosen not to associate with either of those parties.

Plaintiff's lawsuit was filed in June 2017 in the hope of affecting election administration in 2018. That has not been possible because of the ongoing disputes between the governor and General Assembly. Another stay pushes back even further any redress of the rights of unaffiliated and endangers the chances for correction in time to affect the next election cycle.

## CONCLUSION

The motion for a stay should be denied. Defendant-intervenors have failed to show that a stay is necessary. They have failed to show that a stay is needed to preserve court resources or that they will be burdened by the failure to grant a stay. On the other hand, the potential harm to plaintiff and other unaffiliated voters is real. The court's need and ability to resolve the constitutional issues raised by plaintiff will not be affected by ongoing state matters.

By all logic, if any proceedings should be stayed it ought to be those in state court. The retention or loss of a single unaffiliated election board member

13

will not make any significant difference in the resolution of plaintiff's federal constitutional claim, but recognition of the right of independent voters to participate on election boards could alter fundamentally how North Carolina organizes its election administration. If defendant-intervenors were truly interested in the most efficient route to resolving all election board issues they would want plaintiff's lawsuit decided first.

RESPECTFULLY SUBMITTED, this 15th day of October 2018.

/s/ Michael Crowell
Michael Crowell, Attorney
State Bar # 1029
1011 Brace Lane
Chapel Hill, NC 27561
919-812-1073
lawyercrowell@gmail.com

*Attorney representing himself*

## CERTIFICATE OF COMPLIANCE

Plaintiff certifies that pursuant to MDNC Local Rule 7.3(d) this Plaintiff's Response Opposing Motion for Stay contains fewer than 6,250 words (including the body of brief, headings, and footnotes) as reported by the word-processing software.

/s/ Michael Crowell
Michael Crowell
*Plaintiff representing himself*

# CERTIFICATE OF SERVICE

I certify that on October 15, 2018, I electronically filed this Plaintiff's Response Opposing Motion for Stay with the Clerk of Court using the CM/ECF system and have verified that such filing was sent electronically using the CM/ECF system to the following:

> James Bernier, Jr.
> Special Deputy Attorney General
> N.C. Department of Justice
> PO Box 629
> Raleigh, NC 27602
> jbernier@ncdoj.gov
> *Counsel for defendants State of North Carolina, Bipartisan State Board of Elections and Ethics Enforcement, and chair and members of the Bipartisan State Board of Elections and Ethics Enforcement*
>
> D. Martin Warf
> Noah H. Huffstetler, III
> Nelson Mullins Riley & Scarborough LLP
> 4140 Parklake Avenue, Suite 200
> Raleigh, NC 27612
> noah.huffstetler@nelsonmullins.com
> martin.ward@nelsonmullins.com
> *Counsel for defendant-intervenors Berger and Moore*
>
> Brian D. Rabinovitz
> Special Deputy Attorney General
> Amar Majmundar
> Special Deputy Attorney General
> Olga E. Vysotskaya de Brito
> Special Deputy Attorney General
> NC Department of Justice
> PO Box 629
> Raleigh, NC 27602
> brabinovitz@ncdoj.gov
> amajmundar@ncdoj.gov

ovysotskaya@ncdoj.gov
*Counsel for defendant Cooper*

This 15th day of October 2018.

/s/ Michael Crowell
Michael Crowell, Attorney
NC State Bar No. 1029
1011 Brace Lane
Chapel Hill, NC 27516
919-812-1073
lawyercrowell@gmail.com

*Attorney representing himself*