IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-CV-00515

| | |
|---|---|
| MICHAEL CROWELL,<br><br>　　Plaintiff,<br><br>v.<br><br>ROY COOPER, Governor of North Carolina, in his official capacity only; ROBERT B. CORDLE, Chair, State Board of Elections, in his official capacity only; STELLA ANDERSON, JEFF CARMON III, DAVID C. BLACK, and KEN RAYMOND, members, State Board of Elections, in their official capacities only;<br><br>　　Defendants. | **STATE BOARD MEMBERS' REPLY TO PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS** |

Defendants ROBERT B. CORDLE, STELLA ANDERSON, JEFF CARMON III, DAVID C. BLACK, and KEN RAYMOND, in their official capacities as members of the State Board of Elections ("State Board Defendants"), respectfully submit this reply to Plaintiff's Response to the Motion to Dismiss (Doc. 74).

## RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

State Board Defendants respond to Plaintiff's Statement of Facts only to correct assertions regarding the powers granted to the State Board and county boards of elections.

Contrary to Plaintiff's assertion that the elections boards "have pervasive control of all aspects of elections," Pl's. Resp. 3, the authority of the elections boards is cabined

by the myriad statutory provisions that regulate the boards' administrative actions. *See* N.C. Gen. Stat. ch. 163A, arts. 1, 15–27. The sum of these provisions is a detailed regulatory framework that guides the decisions of elections boards on each of the subjects mentioned by Plaintiff. *See id.* §§ 163A-860 to -888 (voter registration), -910 to -920 (challenges to voters), -1025 to -1030 (challenges to candidates), -1065 to -1079 (precinct boundaries), -1045 to -1050 (polling places), -1107, -1108, -1112, -1113, -1114 (ballot format), -1111, -1115 to -1119 (voting equipment), -1410 to -1519 (campaign finance regulations), -1300, -1303 (one-stop voting locations and hours), -766 (county board appointments), -774 (employment of election directors), -1166, -1169 (ballot counting), -1172, -1173 (canvassing votes), -1174, -1175, -1392 (recounts and investigation of irregularities), -1184 (certification of winners), -1177 to - 1180 (protests), -1179 (evidentiary hearings), -1181 (ordering new elections).

The actions of the State Board and county boards are also subject to judicial review. *See id.* §§ 163A-741(*l*) (review of decisions of State Board "in the performance of its duties"), -882(c) (denial of voter registration), -919 (voter challenge decisions), -1030 (candidacy challenge decisions), -1075 (precinct alteration decisions), -1183(b) (election protest decisions), -1444 (declaration of nomination or certificates of election); *see also id.* § 150B-38(a)(6) (N.C. Office of Administrative Hearing review of campaign finance decisions).

These facts undercut Plaintiff's attempt to characterize the state's elections boards as having unfettered control over North Carolina's elections processes. Although the

2

elections boards do exercise policymaking and adjudicatory discretion, that authority is circumscribed by statutes and judicial review.

Plaintiff also exaggerates the extent to which the powers of North Carolina's elections boards are unique compared to other states. Although the undersigned have not undertaken an exhaustive fifty-state review, among nearby states, both Maryland and the District of Columbia grant their boards of election comparable powers. Maryland's State Board of Elections, for example, has the power to "supervise the conduct of elections in the State," Md. Code, Elec. Law. § 2-102(b)(1), and has jurisdiction, together with the county boards, over all voter registration, § 3-101, challenges to voters, § 3-602, precinct boundaries and polling places, § 2-303, ballot format, § 9-202, voting equipment, § 9-101, campaign finance laws, §§ 13-101 to 13-605, provisional and early voting, § 9-403, ballot counting, canvassing, and certification of winners, §§ 11-301, 11-308, 11-603, and recounts, § 12-106. The District of Columbia Board of Elections likewise has the power to conduct elections, set precincts, register voters, operate polling places, certify results, design ballots, adjudicate challenges to voters, conduct recounts, *see* D.C. Code §§ 1-1001.03 to 1-1001.11, and administer the campaign finance system, §§ 1-1163.01 to 1-1163.38. These similarly empowered boards defeat Plaintiff's characterization of our elections boards as outliers.

3

# ARGUMENT

## I. Plaintiff Lacks Standing to Challenge County Board Appointments.

Plaintiff offers no authority to show he has standing to challenge the county board appointments law, which permits the appointment of unaffiliated voters. *See* Defs.' Mem. 5–8 (Doc. 67). Instead, he merely reiterates his allegation that the Governor did not make any unaffiliated appointments; he then offers legal arguments concerning whether his allegations state a plausible claim for relief under the *Twombly/Iqbal* analysis. Pl.'s Resp. 5–6.

Plaintiff provides no response to the Third Circuit's analysis of this question in *Adams v. Governor of Delaware*, 922 F.3d 166, 175 (3d Cir. 2019). There, the court was faced with a situation squarely on point, where a law permitted the judicial appointment of the unaffiliated plaintiff because there was "no party requirement" attached to the position. *Id.* at 174. Despite the plaintiff's protestations that he might not "successfully apply for a position," the court held that he nonetheless lacked standing because the law permitted him to be considered. *Id.* at 175.

Plaintiff also brushes aside, with no authority, Defendants' argument that he lacks standing to seek relief regarding appointments to the 99 boards of elections in counties where he does not reside. He asserts that this issue "is about remedy rather than standing." Pl.'s Resp. 7. But the Supreme Court has instructed that "a plaintiff must demonstrate standing for each claim he seeks to press *and for each form of relief that is sought*." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (emphasis added). This requirement goes to the heart of Article III's case or controversy

requirement, helping to "'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Plaintiff also asserts in his response that he is "representative of unaffiliated voters throughout the state." Pl.'s Resp. 7. He therefore contends that he has a sufficient stake in the appointments of the 99 boards in counties where he does not live (and does not vote) to seek a mandatory injunction regarding those appointments. *Id.* Plaintiff offers no law that would permit such representational standing and, tellingly, he provides no rebuttal to the State Defendants' legal authorities that hold otherwise. *See* Defs.' Mem. 8–11. Courts generally reject standing where litigants seek relief on behalf of a large class of people whom the litigants cannot show they actually represent. Plaintiff makes no attempt to show that he can represent such a diverse group as unaffiliated voters.

## II. The *Anderson-Burdick* Analysis Does Not Apply to Appointments to the Elections Boards.

Certain election laws challenged under the Equal Protection Clause are subject to the balancing test articulated by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992). However, contrary to Plaintiff's arguments, *see* Pl's. Resp. 7–11, the heightened scrutiny imposed by the *Anderson-Burdick* framework does not apply to laws, like the one at issue here, that merely regulate appointments to state administrative offices with responsibility related to elections. Thus, rational-basis scrutiny applies.

5

The *Anderson-Burdick* analysis has typically been used for laws that directly implicate the access of candidates to the ballot, *e.g.*, *Burdick*, 504 U.S. at 434–42 (prohibition on write-in voting); *Anderson*, 460 U.S. at 790–806 (early filing deadline for independent candidates); *Delaney v. Bartlett*, 370 F. Supp. 2d 373, 377 (M.D.N.C. 2004) (signature requirement for unaffiliated candidate's access to ballot), or that directly affect the ability of voters to exercise their right to vote, *e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (voter photo identification requirement). As the Second Circuit has explained, "*Anderson*, *Burdick*, and their progeny . . . all involve *direct* restrictions on speech or access to the ballot." *Molinari v. Bloomberg*, 564 F.3d 587, 604-05 (2d Cir. 2009) (emphasis added).

Plaintiff cites a number of cases that he claims support the idea that appointments to elections boards implicate the right to vote and should be subject to *Anderson-Burdick*. *See* Pl's. Resp. 8–10. Those cases in fact prove *Defendants'* point—none of them concerns the structure of a state's election administration; they instead concern direct restrictions on voting, ballot access, or similar topics like malapportionment. As opposed to the appointments law, the regulations examined in those cases are akin to the election restrictions that *Anderson* itself identified as archetypal examples of when to apply its framework. 460 U.S. at 788 (identifying "the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself").

Conversely, there is considerable authority holding that appointments to offices related to elections fall outside of the *Anderson-Burdick* ambit. *E.g.*, *Werme v. Merrill*, 84 F.3d 479, 483–86 (1st Cir. 1996) (applying rational basis to law denying third parties

6

the ability to appoint election inspectors and ballot clerks; finding "no abstract constitutional right to be appointed" to such an office); *Harris v. Conradi*, 675 F.2d 1212, 1216 (11th Cir. 1982) (finding the appointment of more Democratic than Republican election administrators did not "affect[] any person's right to vote" and therefore was not subject to exacting scrutiny); *Republican Party of Penn. v. Cortés*, 218 F. Supp. 3d 396, 408–09 (E.D. Pa. 2016) (collecting cases discussing when to apply *Anderson-Burdick* and holding that rational basis scrutiny applied to a law regulating the appointment of poll watchers); *Pirincin v. Bd. of Elections of Cuyahoga Cty.*, 368 F. Supp. 64, 68–79 (N.D. Ohio 1973) (applying rational basis to uphold an appointment system for county boards of elections open to the largest two political parties only). Appointments to elections boards are simply too attenuated from the fundamental rights the *Anderson-Burdick* framework seeks to protect.

The cases supporting Defendants' argument cannot be consigned to mere factual differences; they instead articulate a broader legal principle. In all of them, courts applied a rational basis standard to state choices as to how best to organize their appointments and election administration machinery, consistent with the "uncontroversial proposition that the legislature in each state of our federal system possesses the presumptive authority to regulate elections within that state's sovereign territory," *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 714 (4th Cir. 2016). Indeed, the application of heightened scrutiny in this context could potentially enmesh the courts in numerous disputes concerning the structure and internal governing procedures of state elections agencies.

7

Given the differences between the present case and the circumstances in which *Anderson-Burdick* has applied, the Court should apply a rational basis standard and uphold the appointment system for the reasons discussed in Defendants' opening brief. *See* Defs.' Mem. 11–19.

### III. Even if *Anderson-Burdick* Applied, the Appointment System Is Constitutional.

Even if the *Anderson-Burdick* framework were to apply, the appointments law would easily survive the analysis.

Under *Anderson-Burdick*, courts use a sliding scale, weighing the "character and magnitude of the asserted injury" to protected rights against the "precise interests put forward by the State as justifications for the burden imposed." *Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017) (internal citations and quotation marks omitted). Only if a law imposes a "severe" restriction will strict scrutiny be applied. *Id.* Conversely, a provision that "imposes only reasonable, nondiscriminatory restrictions . . . is generally justified by the State's important regulatory interests." *Id.*

The Supreme Court has emphasized that the *Anderson-Burdick* framework requires a balanced approach that gives considerable leeway to a state's interests. *See Crawford*, 553 U.S. at 190–91. The Court has recognized the importance of states' powers to regulate their own elections and noted that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Burdick*, 504 U.S. at 433.

8

Keeping these principles in mind, the appointment law at issue here does not rise to the "severe" level required to impose strict scrutiny. The law in question is an attenuated, second-order restriction[1] applying to some (but not all) positions on North Carolina's elections boards, rather than a direct restriction on which candidates can run, which voters can vote, and for whom they can vote. As the First Circuit recognized in *Werme*, discussing a law that likewise reserved some positions for members of the two largest parties, "[the law] has no direct impact on ballot access, or on the right to vote, or on the right to one's vote tallied. It is generally thought that indirect effects are less burdensome than direct restraints." 84 F.3d at 485.

Plaintiff argues that because the statute treats unaffiliated voters differently, and because of the wide powers granted to the elections boards, the appointments system constitutes a "severe" restriction. *See* Pl.'s Resp. 12–17. However, the cases Plaintiff cites for this argument all concern *ballot access*—the classic context of the *Anderson-Burdick* test. *See Williams v. Rhodes*, 393 U.S. 23, 31 (1968) ("The right to form a party . . . means little if a party can be *kept off the election ballot*" (emphasis added)); *League of Women Voters v. Diamond*, 965 F. Supp. 96, 100 (D. Me. 1997) ("A law that excludes new or minority views *from the ballot* will be held subject to a higher level of scrutiny." (emphasis added)). There is a significant difference between a law that deprives voters of their ability to actually vote for their desired candidate and a law that places eligibility requirements on appointments to an administrative body overseeing elections. *Burdick* is

---

[1] In other words, it is merely a *regulation of the regulators* of elections.

instructive in this regard: there, a law that prohibited write-in voting was deemed valid and was not subject to strict scrutiny. *See* 504 U.S. at 437–39. In contrast to that direct regulation of ballot access and voting in *Burdick*, it is difficult to see how the law at issue here, which regulates only appointments of election regulators, could be subject to strict scrutiny.

Since strict scrutiny should not be applied, the law in question must be upheld under *Anderson-Burdick* if it can be justified by the state's important regulatory interests when weighed against the burdens imposed by the law. *Id.* at 434. As discussed above, the burden of appointments being reserved for Democrats and Republicans is attenuated and does not directly impact the right to vote or access to the ballot. The appointments law is likewise justified on the grounds discussed in Defendants' opening brief: safeguarding the integrity of the electoral process, promoting public confidence, and promoting efficiency. *See* Defs.' Mem. 14–19. These objectives have long been accepted as adequate grounds for state-imposed restrictions, including in similar contexts. *See, e.g.*, *Crawford*, 553 U.S. at 197 (promoting public confidence); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."); *Werme*, 84 F.3d at 484–87 (finding a restriction on election inspectors to the two major parties imposed only a "slight" burden and was justified by the state's interest in efficiency and integrity of the electoral process). As *Timmons* noted, "States also have a strong interest in the stability of their political

10

systems . . . [which] permits them to enact reasonable election regulations that may, in practice, favor the traditional two party system." 520 U.S. at 366–67.

Plaintiff's citation to *Preisler v. Calcaterra*, 243 S.W.2d 62 (Mo. 1951), is inapposite. *See* Pl.'s Resp. 18. The court in *Preisler* limited its holding to the issue of restrictions on poll challengers and watchers whose functions were explicitly partisan and who had "no official or public duties whatsoever." 243 S.W.2d at 65–66. Conversely, the court left untouched the "Board of Election Commissioners," composed solely of Democrats and Republicans, who were the public officers responsible for actually administering the election, *id.*, which is similar to this case.

Finally, Plaintiff's remaining arguments about the increasing proportion of unaffiliated voters, opinion polling, and so forth, *see* Pl.'s Resp. 18–21, might be relevant from a policymaking perspective, but given that a reasonable statute will "generally" be justified by the state's interests, *see Anderson*, 460 U.S. at 788, they hardly rise to the level of identifying a constitutional infirmity. These arguments reveal that, at bottom, Plaintiff's actual disagreement is with the policy choice to reserve most elections board appointments to the two major political parties in the state. The proper forum for that debate is the legislative process.

Thus, while the *Anderson-Burdick* test should not be applied in the instant case, if it is applied, the modest burden the law imposes and the important justifications advanced by the state render it constitutionally valid.

11

## IV. The *Elrod/Branti* Exception Applies to Elections Boards.

Under the First Amendment analysis of *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), political association may be considered for a public appointment if the position is a policymaking role for which political affiliation is a reasonably appropriate job requirement. *See McCaffrey v. Chapman*, 921 F.3d 159, 164–65 (4th Cir. 2019).

Plaintiff denies that elections board members fall within the *Elrod/Branti* policymaking exception. However, his position on this is inconsistent: he argues simultaneously that the elections boards "have pervasive control of all aspects of elections," including over substantial areas of policy, Pl.'s Resp. 3–4; meanwhile, he contends that elections boards members do not fall within the *Elrod/Branti* exception, which is explicitly premised on policymaking authority.

Attempting to reconcile this contradiction, Plaintiff first argues that elections board members should not "bring partisan considerations to the job" because they oversee elections, which requires fairness. *Id.* at 22–23. Fairness in the oversight of elections is undeniably critical. But whether a position requires some degree of impartiality "is not determinative of the *Elrod-Branti* question." *Peterson v. Dean*, 777 F.3d 334, 347–48 (6th Cir. 2015). Courts have rejected this very argument, concluding that partisan affiliation may still be "appropriate" for a position as an election administrator, even if not "essential." *Id.*; *see Soelter v. King Cty.*, 931 F. Supp. 741, 747 (W.D. Wash. 1996), *aff'd*, 132 F.3d 40 (9th Cir. 1997). Plaintiff cites no authority to the contrary.

Second, Plaintiff attempts to invoke the elections boards' adjudicatory authority over election disputes to compare the boards to a court, relying on the Third Circuit's decision in *Adams*. *See* 922 F.3d at 181. But *Adams* held only that the *Elrod/Branti* exception "does not apply to members of the *judicial branch*." *Id*. at 180 (emphasis added). There are fundamental differences between officials of an entirely separate branch of government, whose functions are solely adjudicatory, and an executive branch agency, with both administrative and quasi-judicial functions, that is responsible for implementing policy decisions, *see Cooper v. Berger*, 370 N.C. 392, 415–16, 809 S.E.2d 98, 111–13 (2018). Moreover, two other federal circuits disagree with *Adams* and would apply *Elrod/Branti* to judicial appointments in any event. *See Newman v. Voinovich*, 986 F.2d 159, 163 (6th Cir. 1993); *Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988).

For these reasons, Plaintiff's arguments against the *Elrod/Branti* exception fail.

## **CONCLUSION**

The State Board Defendants request the Court grant their Motion to Dismiss, with prejudice.

Respectfully submitted, this 1st day of July, 2019.

        JOSHUA H. STEIN
        Attorney General

        /s/ Paul M. Cox

        Paul M. Cox
        Special Deputy Attorney General
        N.C. State Bar No. 49146
        pcox@ncdoj.gov

Alexander McC. Peters
Chief Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763

*Attorneys for State Board Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.3(d) of the Local Rules of Civil Practice, the undersigned hereby certifies that the foregoing memorandum does not exceed 3,125 words, exclusive of any cover page, caption, signature lines, certificate of compliance, and certificate of service, as reported by Microsoft Word.

This the 1st day of July, 2019.

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date I electronically filed the foregoing REPLY TO PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

This 1st day of July, 2019.

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General